UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

TANYA A. HAYES,

          Plaintiff,

   -vs-

CAROLYN COLVIN, Commissioner of
Social Security,

          Defendant.

**DECISION and ORDER
No. 1:11-CV-0835(MAT)**

_____

## I.   Introduction

Plaintiff Tanya A. Hayes ("Plaintiff"), represented by counsel, brings this action pursuant to Title II of the Social Security Act ("the Act"), seeking review of the final decision of the Commissioner of Social Security ("the Commissioner")[1] denying her application for Disability Insurance Benefits ("DIB"). This Court has jurisdiction over the matter pursuant to 42 U.S.C. §§ 405(g), 1383(c). Presently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure.

## II.  Procedural History

Plaintiff protectively filed an application for DIB on August 18, 2007, alleging disability since January 2, 2005, due to

---

[1]
    Carolyn W. Colvin has replaced Michael J. Astrue as the Commissioner of Social Security. She therefore is automatically substituted as the defendant in this action pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

breathing problems, heel spurs, and carpal tunnel syndrome ("CTS").

After her application was denied, Plaintiff requested a hearing,

which was held before administrative law judge Nancy Gregg

Pasiecznik ("the ALJ") on August 12, 2009. T.30-62.[2] Plaintiff

appeared pro se.[3] On June 23, 2010, the ALJ found Plaintiff not

disabled. T.9-25. The Appeals Council denied Plaintiff's request

for review on August 10, 2011, T.1-4, making the ALJ's decision the

final decision of the Commissioner. Plaintiff timely filed this

action.

## III. Summary of the Administrative Record

### A.   Vocational and Non-Medical Evidence

Plaintiff, born in 1968, was 36-years-old at the time of her

alleged onset date, and 41-years-old at the time of the ALJ's

decision. In her application for DIB, Plaintiff stated that she had

worked as a cashier, customer service representative for a bank,

daycare operator, and a receptionist for a bank. T.117. Plaintiff

indicated that she worked as a "bank receptionist" from 1992 to

1999; this position included typing, filing, copying, sorting mail,

putting away files, and taking phone calls. Id. The job required

---

[2]

Numerals preceded by "T." refer to pages in the transcript of the
administrative transcript, submitted as a separately-bound exhibit by Defendant.

[3]

The ALJ explained to Plaintiff that she had a right to a representative and
that there were organizations which provided free representation, as well as
representatives who worked on a contingency-fee basis. T.34. When asked if she
wanted more time to get a representative, Plaintiff declined and waived her right
to representation. T.34-35, 87.

her to walk for 1 hour, stand for 4 hours, and sit for 4 hours out of an 8-hour day. Id. In November 2007, she described job from 1992 to 1999 as a "bank file clerk", with duties of typing, filing, using fax and copy machines, ordering supplies, handling mail, taking phone calls for the department, making files, and filing. T.130. She stated that in this job she stood for 1 hour and sat for 6 hours per workday. Id. Later, she described her duties at the bank as placing information into clients' files and pulling out files when requested. T.171.

In November 2007, Plaintiff stated in other documents associated with her DIB application that her daily activities included picking up dirty clothes, cleaning and sweeping all rugs and floors, washing dishes, laundry, cleaning the bathroom, and (once a week) sweeping and mopping the bathroom. T.132. She took care of her 2-year-old. T.133, 139. She had no problems with personal care. T.133-34. She cooked meals daily, which took 30 to 45 minutes. T.134. She sometimes needed help with house work because she became short of breath. T.135. She went outside every day, and could travel by walking, riding in a car, or taking public transport. Id. She went shopping bi-weekly for about 1½ hours. T.136. She had trouble walking, climbing stairs, and using her hands. T.137. She had stabbing, aching pain in her lower arm down to her fingers and in both heels, for which she took ibuprofen, used a hand brace, and soaked her feet. T.140-42.

-3-

At the August 2009 hearing, Plaintiff testified that she was a high school graduate and was currently taking accounting courses through an online college. T.36. Her homework consisted of computer research and writing papers. T.50. She had last worked in 2005, running a daycare center. T.37. The only problem she experienced doing this job was that when one of the children was sick, she would end up getting sick. T.38. Plaintiff stated that she had started at M&T Bank as a typist, but when she left she was a file clerk. T.39-40. As a typist, she answered phones, took messages, made copies, faxed, and spoke with anyone who came to see her manager. Id.

Plaintiff testified that she had breathing problems, heel spurs, CTS, pulmonary sarcoidosis,[4] sleep apnea, and a bruised ligament in her right knee. T.41, 51-52. After a sleep study in 2001, she declined to get a continuous positive airway pressure ("CPAP") machine because she needed to be able to hear her asthmatic son if he had breathing issues during the night. T.41. She had undergone a second sleep study in May 2009, but had not yet received the results from her pulmonologist, Dr. Ventresca. T.41-42. In 2009, her asthma attacks required hospital visits three times; prior to that, the last time she had been hospitalized for asthma was in 2005. T.42-43. Her asthma was exacerbated by

---

[4] Sarcoidosis is an inflammatory disease in which abnormal collections of small lumps (granulomas) appear in the affected areas. Tr. 304, 317-18.

colds. Sometimes she could control an attack immediately with a nebulizer; other times it would take about 8 hours. T.44. She had been diagnosed with sarcoidosis in 2000, and was put on prednisone for 6 months. T.46-47. She had not experienced any recurrences of sarcoidosis recently, but she had to take prednisone for 5 days every time she got a cold. T.47.

In 2003, she was diagnosed with CTS in her right hand and was prescribed Darvocet for the pain, which made her sick. She now took ibuprofen and wore a brace as needed, usually once every couple of months if she was on the computer too long. T.48-49. Regarding her heel spurs, Plaintiff stated that if she wore sneakers with heel cushioning then walking did not really bother her. T.49. She did not need any special inserts in her shoes. She did not believe her knee injury would affect her ability to work. T.51.

Plaintiff testified that she had three children, ages 12, 10, and 4. T.36. After getting them off to school she did her own school work. T.50. She cleaned, but would get tired and need 15-to-20-minute breaks. Id. She had allowed her driver's license to expire because she did not have a car. Id. Plaintiff estimated that she could lift and carry 10 to 20 pounds. T.51. She did not have any problems sitting except for leg cramps. Id. She could stand about a half hour before her heels began to hurt. Id. She could climb a flight of stairs but would be out of breath. T.52. She

could bend over to pick something off the ground. Id. Prior to her knee injury she could kneel, crouch, and squat. Id.

Vocational expert Jay Steinbrenner ("the VE") testified at the hearing. T.53-61. After reviewing the vocational documents in the file and listening to her testimony, the VE stated that Plaintiff's past relevant work was in the "light work" jobs of file clerk, customer service clerk, and daycare attendant; and in the "sedentary work" jobs of typist and receptionist in the financial banking industry. T.56-57. The ALJ provided the VE with a hypothetical individual having the same vocational profile as Plaintiff, who could lift, carry, push, and pull up to 20 pounds occasionally and 10 pounds frequently; sit for 2 hours at a time and up to 8 hours total in an 8-hour day; stand/walk for 30 minutes at a time and up to 2 hours in an 8-hour day, with normal breaks; frequently balance and stoop; occasionally crouch, crawl, kneel, and climb stairs and ramps; perform frequent, but not constant, repetitive fingering with her right hand; and avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, persons with communicable diseases, and extremes of heat and cold. T.57-59. The VE stated that this individual could perform Plaintiff's past work as a receptionist, Dictionary of Occupational Titles ("DOT") 237.367-038. Id.

In May 2010, an earnings query showed that Plaintiff earned $23.00 through employment with H&R Block in the first quarter of

2009, and $1,199.00 through employment with the Bob Lanier Center in the third quarter of 2009.  T.109-11.

###    B.    Medical Evidence

In 2000, after experiencing persistent wheezing and shortness of breath, Plaintiff was diagnosed with pulmonary sarcoidosis. A lung biopsy was performed on July 11, 2001, which showed bronchial mucosa with non-caseating granuloma (chronic inflammatory cells which the immune system fails to address), confirming the diagnosis. T.304, 310. Plaintiff was prescribed prednisone, which she took for less than a year. T.238. Plaintiff was hospitalized in 2003 because of severe wheezing due to her asthma, and from 2003 to 2007, she had 5 visits to the emergency room as the result of shortness of breath and wheezing. Id.

Since 2000, Plaintiff has had a sleep disorder which causes daytime drowsiness; she sleeps only about 5½ to 6 hours a night. T.258. She was diagnosed with obstructive sleep apnea ("OSA") based on a nocturnal polysomnogram performed on December 9, 2001. Id. At a checkup on December 14, 2006, Plaintiff complained about her sleep apnea and was given a referral to have another sleep study with titration performed. T.220. A request for records confirmed this study was never done. T.244. In May 2009, Plaintiff underwent a second sleep study at Millard Fillmore Hospital, T.41, but at the time of the hearing she had not obtained the results. Id. She noted

that she had needed to reschedule her appointment with her pulmonologist to September 7, 2009, to get the results.

Sometime in 2006, Plaintiff began experiencing severe pain in her heels. T.238. An X-ray performed on September 18, 2006, showed a small traction spur at the attachment site of the Achilles tendon on the left heel and a traction spur at the attachment site of the Achilles tendon and an approximately 6-mm sclerotic focus in the mid-body of the calcis on the right heel. T.227.

Plaintiff began experiencing pain, numbness and tingling, and other symptoms in her right upper extremity and hand in 2003. T.239. After an EMG study, the results of which are not in the record, Plaintiff was diagnosed with right CTS. Surgery has not been recommended. Id.

On December 13, 2007, consultative physician Jacob Piazza, M.D., examined Plaintiff at the request of the Social Security Administration ("the SSA"). T.238-42. Current medications were Advair, Combivent, and a nebulizer. T.239. Plaintiff reported being able to cook, clean, do laundry, drive, shop, take care of her children, shower, bathe, and dress herself. Id. On examination, she had a normal gait and the ability to walk on heels and toes without difficulty, squat fully, stand normally, and rise from a chair without difficulty. T.240. Plaintiff weighed 264 pounds, appeared to be in no acute distress, needed no help changing for the exam or getting on or off the exam table, and used no assistive devices.

-8-

Id. Her lungs were clear, with normal anterior-posterior diameter, percussion, and diaphragmatic motion; and no significant chest wall abnormality. Id. Dr. Piazza observed that Plaintiff's grip strength was 5/5 bilaterally. She had positive Tinel's sign and Phalen's test in the right wrist, and a slight decrease in sensation over the first 4 fingers of the right hand. T.241.

For his medical source statement, Dr. Piazza opined that due to her sarcoidosis and resultant asthma and wheezing, Plaintiff has moderate limitation for exposure to dust, fumes, animals, and pollens; and moderate limitation for exposure to extremes of heat and cold. T.241. Dr. Piazza stated that Plaintiff's CTS results in a mild limitation to the use of her right hand for lifting, carrying, reaching, grasping, and doing a "repetitive motion type of activity". T.241-42. Finally, Dr. Piazza opined that her heel spurs do not cause any limitation. T.242.

On January 10, 2008, State Agency disability non-physician examiner M. McLaughlin ("the Disability Examiner") completed a Physical Residual Functional Capacity ("RFC") Assessment. T.245-50. The Disability Examiner indicated that Plaintiff has the ability to perform light work, including lifting and carrying 10 pounds occasionally and 20 pounds frequently; standing and/or walking for 6 hours in an 8-hour workday, sitting for 6 hours; and pushing or pulling with no limitations. T.246. The Disability Examiner stated

that Plaintiff was limited in her ability to handle and finger items and should avoid repetitive use of her right hand. T.247.

In November 2008, Plaintiff called the Erie County Medical Center ("ECMC") requesting refills of Duoneb for her nebulizer and Advair. T.278. It was noted that she last had been seen there in December 2006. Id.

On March 5, 2009, Plaintiff presented at the ECMC emergency room complaining of right knee pain for the past two weeks and increased swelling due to being on her feet "a lot lately". T.292. Her right knee showed tenderness to palpation in the lateral aspect, no swelling, and full range of motion with pain. She had "mild" edema in her ankles bilaterally. Right knee x-ray showed no arthritis or fracture. T.290. Plaintiff was diagnosed with a right knee strain in stable condition. T.297. She was prescribed Motrin and limited to no prolonged standing or walking for the next week. T.298. She was instructed to rest and use an immobilizer, cane, ice, elevation. Id.

On March 16, 2009, Plaintiff returned to ECMC, complaining of right knee pain of moderate severity. T.271-72. She was diagnosed with right knee pain and swelling with no mechanical injury and given Ultram. Id.   On March 25, 2009, a magnetic resonance imaging ("MRI") study of Plaintiff's right knee showed a partial tear (grade II injury) involving the femoral attachment of the popliteus tendon and fibular collateral ligament and small joint effusion.

T.288-89. Plaintiff's medial and lateral meniscus, medial collateral ligament, and cruciate ligaments were intact. Id.

In April 2009, Plaintiff returned to ECMC complaining of severe, intense knee pain, but no bruising, tingling, or numbness. T.266. She had swelling and pain with deep palpation. Gait was with weight on the left leg, with range of motion severely limited by pain and reduced strength. Id. She was referred for physical therapy and a brace. T.266, 269.

Later in April 2009, Plaintiff saw her pulmonologist Dr. Ventresca complaining of minor pain in her right knee. Id. She complained of "occasional" asthma attacks since 2003 with occasionally labored breathing on exertion especially, climbing stairs or walking 1 to 2 blocks. Id. She still had disrupted sleep. Id. Dr. Ventresca diagnosed sarcoidosis in remission, stable asthma, and OSA in need of re-evaluation. Id.

At the end of April, Plaintiff followed up for her knee pain. T.260. She was doing physical therapy at home, and her pain was 0/10. Id. Examination showed she was comfortable, with effusion and tenderness to palpation. Id. Range of motion was decreased by 10 degrees compared to the left knee. Id. Strength was 5/5 bilaterally. Id. Plaintiff also complained of increased cough and phlegm for the past four days. T.262.

In July 2009, Plaintiff returned to ECMC complaining of exacerbation of asthma symptoms. T.299-300. She was prescribed

-11-

Ventolin, Advair, Singular, and six days of prednisone. T.300. She was allowed to resume activity as tolerated in 4 days with no restrictions, and told to follow up with the pulmonary clinic in 1 month. T.299.

## IV.  Standard of Review

Title 42 U.S.C., § 405(g) authorizes district courts "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing." This Court's function is not to determine de novo whether a claimant is disabled, Pratts v. Chater, 94 F.3d 34, 37 (2d Cir. 1996) (citation omitted), but rather to evaluate whether the Commissioner applied the correct legal standard in making the determination and, if so, whether such determination is supported by substantial evidence in the record. E.g., Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000) (citing 42 U.S.C. § 405(g); Bubnis v. Apfel, 150 F.3d 177, 181 (2d Cir. 1998)).

This Court must independently determine if the Commissioner applied the correct legal standards in determining that the claimant is not disabled. See Townley v. Heckler, 748 F.2d 109, 112 (2d Cir. 1984). "Failure to apply the correct legal standards is grounds for reversal." Id. Therefore, this Court first reviews the Commissioner's application of the pertinent legal standards, and then, if the standards were correctly applied, then considers the

substantiality of the evidence. See Johnson v. Bowen, 817 F.2d 983, 985 (2d Cir. 1987) (stating that "[w]here there is a reasonable basis for doubt whether the ALJ applied correct legal principles, application of the substantial evidence standard to uphold a finding of no disability creates an unacceptable risk that a claimant will be deprived of the right to have her disability determination made according to the correct legal principles").

## V.   Eligibility for DIB

To establish disability under the Act, a claimant bears the burden of demonstrating (1) that she has been unable to engage in substantial gainful activity by reason of a physical or mental impairment that has lasted or could have been expected to last for a continuous period of at least twelve months, and (2) that the existence of such impairment has been demonstrated by evidence supported by medically acceptable clinical and laboratory techniques. 42 U.S.C. § 1382c(a)(3); see also Barnhart v. Walton, 535 U.S. 212, 215 (2002).

To determine disability, the Commissioner uses a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520, 416.920; see also Williams v. Apfel, 204 F.3d 48, 48-49 (2d Cir. 1999). The burden of proof is on the claimant at the first four steps of the evaluation. Perez v. Chater, 77 F.3d 41, 46 (2d Cir. 1996). If the claimant establishes that she is unable to perform any of her past relevant work, there is a limited burden shift at the fifth step to

the Commissioner, who must determine whether the claimant is capable of performing other work that exists in significant numbers in the national economy. 20 C.F.R. §§ 404.1520, 416.920; see also Bapp v. Bowen, 802 F.2d 601, 604 (2d Cir. 1986). In making his decision, the ALJ must consider "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Brown v. Apfel, 174 F.3d 59, 62 (2d Cir. 1999) (quotation omitted).

## VI.  The ALJ's Decision

At the first step of the sequential evaluation, the ALJ found that the evidence did not clearly establish that Plaintiff had engaged in substantial gainful activity after January 2005, the alleged onset date. T.14. At step two, the ALJ found that Plaintiff's asthma, obesity, and right CTS were severe impairments; her right knee strain, with mild degenerative changes and a partial tear, was a severe impairment as of March 2009. T.14-15. At step three, the ALJ found that Plaintiff did not have an impairment, or combination of impairments, which met or equaled the criteria of any listed impairment in 20 C.F.R. Part 404, Subpart P, App. 1. See T.15-20.

The ALJ next determined that Plaintiff had the RFC to lift, carry, push, and pull up to 20 pounds occasionally and 10 pounds

frequently; sit for 2 hours at a time and up to 8 hours total in an 8-hour day; stand/walk for about 6 hours total in an 8-hour day, with normal breaks, prior to March 5, 2009; frequently balance and stoop; occasionally crouch, crawl, and climb stairs and ramps; never climb ropes, ladders, or scaffolds; use her left arm/hand without limitation; perform frequent, but not constant, repetitive fingering with her right hand, with no other limitations of her right arm/hand; and avoid concentrated exposure to fumes, odors, dusts, gases, poor ventilation, extremes of heat and cold, and extreme humidity and dampness. After March 5, 2009, due to her knee strain, Plaintiff could only stand/walk intermittently for a combined total of 2 hours in an 8-hour day, with normal breaks.

Thus, the ALJ found that Plaintiff could perform the exertional requirements of light work prior to March 5, 2009, which involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds, the ability to push or pull arm or leg controls, and, in an 8-hour workday, the ability to stand or walk for up to 6 hours and sit for up to 6 hours. See 20 C.F.R. §§ 404.1567(b); Social Security Ruling ("SSR") 83-10. After March 5, 2009, Plaintiff could perform the exertional requirements of sedentary work, which involves lifting no more than 10 pounds at a time, and, in an 8-hour workday, the ability to stand and walk a total of up to 2 hours and sit up to 6 hours. See 20 C.F.R. § 404.1567(a); SSR 96-9p.

Finally, the ALJ relied on the VE's hearing testimony to find that Plaintiff could perform her past relevant work as a receptionist, and therefore she is not disabled. T.24-25.

## VI.  Plaintiff's Contentions

### A.  Erroneous Determination that Plaintiff Had Past Relevant Work as a Receptionist

Plaintiff argues that the ALJ erred by concluding that she could perform her past relevant work as a receptionist, without making specific findings as to the physical and mental demands of that work. See SSR 82-62. Plaintiff asserts that an ALJ cannot simply rely on the claimant's self-reporting of the job title, but must fully explore past work as required by SSR 82-62. See also Steficek v. Barnhart, 462 F. Supp.2d 415, 421 (W.D.N.Y. 2006) (remanding where the ALJ stated that claimant's past work as radio announcer and control board operator "required no heavy lifting and was performed primarily in the seated position" and failed to make findings as to the mental demands of such work, despite his own finding that claimant suffers from anxiety disorder, dysthymia, and a personality disorder). Plaintiff concedes that the ALJ questioned her about her past jobs at the hearing, but failed to ascertain that she ever worked as a receptionist. Plaintiff points to an alleged discrepancy between the undated Disability Report—Adult Form SSA-3367, where Plaintiff listed her "receptionist" job at M&T Bank from 1992 to 1999, T.117; and the Work History Report Form SSA-3369-BK dated November 8, 2007, and presumably filled out at

-16-

the same time as the 3367 form, where Plaintiff described her job at M&T Bank from January 1992 to May 1999, as a "Bank File Clerk", T.125.

After reviewing the record, the Court finds that the ALJ did not run afoul of SSR 82-62, which provides that

> [t]he claimant is the primary source for vocational documentation, and statements by the claimant regarding past work are generally sufficient for determining the skill level; exertional demands and nonexertional demands of such work.. . . . Information concerning job titles . . . and a description of tasks and responsibilities will permit a judgment as to the skill level and the current relevance of the individual's work experience.

SSR 82-62. Regardless of how Plaintiff identified her position at M&T Bank (i.e., as a receptionist or a file clerk), her description of the job duties was essentially the same throughout her tenure there: typing, filing, copying, faxing, sorting mail, ordering supplies, taking phone calls for the department, taking messages, and speaking with anybody that came to see her manager. See T.39-40, 117, 130, 171. These duties match those assigned to the job title of "receptionist", as set out in the DOT (i.e., receiving and directing callers, taking messages, typing, performing clerical duties, and collecting and distributing mail). See T.190. Based on her testimony and other statements in the record, it appears that Plaintiff performed such duties throughout the period from 1992 to 1999. See T.39-40, 117, 130, 171. Therefore, it was reasonable for the ALJ to conclude that she accumulated the 3 to 6 months required by the DOT to master the position of receptionist. See T.191.

-17-

As Defendant notes, the ALJ did err in concluding that Plaintiff could perform her past work as a receptionist *as she actually performed it*. T.24. The functional requirements of her receptionist job, as set forth in Plaintiff's disability report and work history report, <u>see</u> T.117, 130, exceed the RFC as determined by the ALJ, <u>see</u> T.21. However, for a step four error to warrant remand, the claimant has "the burden to show an inability to return to her previous specific job *and* an inability to perform her past relevant work generally." <u>Jasinski v. Barnhart</u>, 341 F.3d 182, 185 (2d Cir. 2003)(emphasis in original); <u>see also</u> SSR 82-61. Because, as discussed further below, the ALJ did not err in finding that Plaintiff had the RFC to perform her past relevant work as a receptionist as it is normally performed in the national economy, the ALJ's error in finding she could perform her past work as she had actually performed it is harmless error. <u>See generally</u> <u>NLRB v. American Geri-Care, Inc.</u>, 697 F.2d 56, 64 (2d Cir. 1982).

**B.    Failure to Develop the Record**

Plaintiff argues that the ALJ was required to recontact Millard Fillmore to obtain records regarding the results of her May 2009 sleep study. As noted above, Plaintiff testified at the hearing on August 12, 2009, that she had undergone a sleep study in May 2009, but had not received the results because her appointment with Dr. Ventresca had been moved to September 7, 2009. T.41. Prior to the hearing, on June 4, 2009, the ALJ's office had requested

Plaintiff's records from ECMC, and received 39 pages of records on August 13, 2009. See T.259, 264-65, 260-98. Included in these records was an April 2009 note from Dr. Ventresca stating that Plaintiff was due to return to the clinic on June 11, 2009, to get the results of the May 2009 sleep study. T.264-65. Thus, by the time of the hearing on August 12, 2009, Plaintiff had rescheduled her appointment with Dr. Ventresca.

Although the ALJ must attempt to fill in any "clear gaps" in the administrative record, "where there are no obvious gaps . . . and where the ALJ already possesses a 'complete medical history,'" the ALJ is under no obligation to seek additional information. Rosa v. Callahan, 168 F.3d 72, 79, n. 5 (2d Cir. 1999); 20 C.F.R. § 404.1512(e) (prior version)[5] (when the evidence received from treating and other medical sources is inadequate for an ALJ to determine whether a claimant is disabled, the ALJ will need to attempt to obtain additional evidence).  The onus is on the claimant, however, to "bring to [the SSA's] attention everything that shows that [she] [is] blind or disabled." 20 C.F.R. § 1512(a). This Plaintiff did at the hearing, by notifying the ALJ that she had been required to reschedule her appointment and would not have the results until after the hearing.

---

[5]

Effective March 26, 2012, the Commissioner amended 20 C.F.R. § 404.1512 to remove the above-cited § 404.1512(e) and the duty it imposed on ALJs to re-contact a claimant's treating physician under certain circumstances. See 20 C.F.R. § 404.1512 (Mar. 26, 2012); Lowry v. Astrue, Civil No. 11-1515, 2012 WL 1142308 at *2, n.2 (2d Cir. Apr. 6, 2012).

Although the Court agrees with Plaintiff that the ALJ erred by failing to recontact Dr. Ventresca or Millard Fillmore (where Plaintiff had the second sleep study performed) after the hearing, the error was harmless. The Court notes that when she had her first sleep study in 2001, Plaintiff reported that her daytime activities were not impaired as the result of her OSA and did not take daytime naps. Although Plaintiff told the consultative examiner in 2007, that she needed to take naps during the day, she did not indicate any need to take daytime naps on her disability questionnaires; nor did she mention anything about daytime drowsiness at the August 2009 hearing. Even with a prior diagnosis of OSA, Plaintiff declined to use a CPAP, citing concerns that she would not be able to hear her son if he had asthma issues. The additional results of a sleep study thus would not have added anything critical to the record, and the ALJ was not precluded from making a disability determination based on the evidence in the record.

Plaintiff also argues that the ALJ was required to obtain the 2003 EMG testing pursuant to which Plaintiff was diagnosed with CTS. An ALJ need only develop a claimant's complete medical history for the 12 months preceding the month in which the application was filed, see 20 C.F.R. § 404.1512(d), and Plaintiff protectively filed her application approximately 48 months later, in August 2007. T.112. Moreover, the 2003 testing report would not indicate the severity of Plaintiff's condition during the time-period

relevant to the disability analysis. Notably, Plaintiff did not seek medical attention specifically for her CTS throughout the relevant time period. <u>See</u> T.239. She informed consultative examiner Dr. Piazza that she had "some" numbness, tingling, and pain in her right forearm and hand, but had only been prescribed a splint to wear at night and when the symptoms were bothering her. Surgery apparently has never been recommended. T.239.  Because there were no "obvious gaps," <u>Rosa</u>, 168 F.3d at 79, n.5, in the record related to Plaintiff's CTS, the ALJ was not obligated to request the 2003 EMG test results.

Finally, Plaintiff's contends that the ALJ failed duty to develop the record for the period from August 2009, to June 2010 is meritless. Further plaintiff did not alert the ALJ to any new or worsening issues that occurred after the hearing, which might have triggered a need for the ALJ to re-contact plaintiff's physicians. See 42 U.S.C. § 423(d)(5)(A)(Congress places the burden upon a claimant establish eligibility for DIB by requiring her to "furnish[] such medical and other evidence of the existence thereof as the Commissioner . . . may require). the ALJ sent a letter to plaintiff in May 2010, explicitly stating that plaintiff could provide any additional records that she wished the ALJ to consider and stating that Plaintiff could request a supplemental hearing at which additional evidence could be considered. T.200-01. The letter also stated that Plaintiff could request the ALJ to issue a

subpoena for additional records. Id. Plaintiff responded to the ALJ's letter without submitting any additional evidence or requesting a supplemental hearing or subpoenas. See T.202.

### C.   Failure to Properly Evaluate the Opinion Evidence

Plaintiff argues that the ALJ erred in failing to properly weigh the opinions of consultative physician Dr. Piazza and the Disability Examiner as required under 20 C.F.R. § 404.1527(d) and SSR 06-03P. As Plaintiff notes, § 404.1527(d) provides that "regardless of source," the Commissioner will evaluate every medical opinion it receives, and unless a treating source's opinion is given controlling weight, the Commissioner will consider six factors in deciding the weight to be given "to any medical opinion." 20 C.F.R. §§ 404.1527(d); see also SSR 06-03p ("Although the factors 20 CFR 404.1527(d) and 416.927(d) explicitly apply only to the evaluation of medical opinions from 'acceptable medical sources,' these same factors can be applied to opinion evidence from 'other sources.'").

The ALJ stated that Dr. Piazza's "objective opinion was given significant weight." T.24. Subsequently, the ALJ stated that she "afforded greater weight to Dr. Piazza's opinion, given his programmatic expertise[,]" T.24, than she assigned to Plaintiff's subjective testimony. Plaintiff faults the ALJ for failing to discuss any of the factors set out in § 404.1527(d) in connection with statement that Dr. Piazza's opinion was afforded "significant

weight". However, § 404.1527(d)'s factors apply when the ALJ does not give a treating source's opinion controlling weight. Here, there was no medical source statement from a treating source; the only opinions were from Dr. Piazza and the Disability Examiner. Plaintiff also argues that since Dr. Piazza is not a State agency physician or employee of the SSA, the ALJ's claim that Dr. Piazza "has programmatic knowledge" is unsubstantiated.

Plaintiff is correct that Dr. Piazza is not a State agency physician or SSA employee but, as Defendant notes, State disability agencies manage the consultative examiner program, and the Commissioner's regulations require that the State agency provide "a process for the orientation, training, and review of new consultative examination providers, with respect to SSA's program requirements involving consultative examination report content." 20 C.F.R. § 404.1519s(f)(2). Even if Dr. Piazza does not have "programmatic expertise," this is of no moment because the ALJ did not err in assigning "significant weight" to Dr. Piazza's opinions. After reviewing the administrative transcript, the Court concludes that Dr. Piazza's opinions are internally consistent and are not contradicted by any evidence in the record. See Tilbe v. Astrue, No. 5:10-CV-910 NAM/ATB, 2012 WL 2930784, at *13 (N.D.N.Y. July 17, 2012) ("[T]he ALJ's reliance on [the consultative examiner]'s opinion was proper. The doctor's conclusions are not contradicted by any evidence in the record.") (citing Mongeur v. Heckler, 722

-23-

F.3d 1033, 1039 (2d Cir. 1983) ("In assessing opinions, a written report by a licensed physician who has examined plaintiff may constitute substantial evidence supportive of a finding by the hearing examiner."); other citation omitted). Accordingly, there is no reason why Dr. Piazza's opinion cannot provide substantial evidence to support the ALJ's RFC assessment.

## VIII.    Conclusion

For the reasons discussed above, Plaintiff's motion for judgment on the pleadings (Dkt #8) is denied, Defendant's cross-motion for judgment on the pleadings (Dkt #12) is granted, and the Commissioner's decision is affirmed. The Clerk of the Court is requested to close this case.

**SO ORDERED.**

S/Michael A. Telesca

_____

HONORABLE MICHAEL A. TELESCA
United States District Judge

DATED:    May 23, 2014
          Rochester, New York